THE BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF ESSEX.

*v.*

GEORGE LINDSLEY et al.

1. A principal may lawfully indemnify his surety against loss in consequence of his suretyship.

2. A debtor has a right to prefer one or more of his creditors over the others, and so long as he exercises this right honestly his acts, whether the preference be created by sale or pledge, are unimpeachable.

3. A provision in a contract, providing that if the contractor fails to pay the debts he incurs in performing the contract, the other contracting party shall, on the presentation of such debts to them, have the right to withhold any moneys earned under the contract until such debts are paid, does not operate as an equitable assignment of the moneys earned under the contract, nor prevent the contractor, prior to the presentation of such debts, from making a valid assignment of the moneys.

4. So long as a sheriff's sale stands, the price which the purchaser agreed to pay and the sheriff to accept must be taken as a conclusive test of the value of the thing sold.

On final hearing under a decree directing defendants to interplead. Heard on answers and proofs taken in open court.

*Mr. John L. Blake* and *Mr. John W. Taylor,* for George Lindsley.

*Mr. Thomas N. McCarter,* for all the defendants claiming adversely to George Lindsley.

*Mr. F. H. Pilch,* for James R. Sayre & Co., Marcus Sayre & Co., Isaac Ogden & Son and Lewis L. Carlisle.

*Mr. William A. Righter,* for Philip Hochule.

*Mr. J. F. Fort,* for Cleveland & Frank.

*Mr. Charles F. Hill,* for Van Steenbergh & Clark.

*Mr. Joseph L. Munn,* for the Newark Lime and Cement Manufacturing Company.

*Mr. G. D. W. Vroom,* for George E. Fell.

*Mr. Charles Borcherling,* for Abner S. Reeve & Co.

VAN FLEET, V. C.

This suit was commenced by bill of interpleader. On the 13th of August, 1881, Frederick W. Morriss entered into a contract with the board of chosen freeholders of the county of Essex by which he agreed to find all the material necessary to be provided, and to do all the work necessary to be done in the erection and completion of the mason work of the new lunatic asylum building which the board had previously determined to erect in the city of Newark. The price which the board agreed to pay Morriss was $53,000. Eighty per cent. of the value of the work done each month, as estimated by the architects superintending the construction of the building, was to be paid on the

first of the succeeding month, and the remaining twenty per cent. on the completion of the building.

At the time the contract was signed, George Lindsley became one of two sureties on a bond executed by Morriss to the board, in the sum of $26,500, for the faithful performance of his contract. Morriss commenced to perform the contract shortly after its execution, and continued to do so until the 14th of October, 1882, when, for want of means to continue work under it, he assigned the contract to Lindsley, together with all the moneys due and to grow due thereon. Lindsley then completed what remained to be done, expending for that purpose over $8,000. On the completion of the building there was due from the county a balance of $18,560. At the time Morriss assigned the contract to Lindsley, Morriss owed nearly $14,000 for material which he had purchased to perform his contract. The creditors holding these debts, very soon after the assignment, demanded payment of Morriss, and he failing to pay, they gave notice to the board of chosen freeholders, pursuant to the third section of the mechanics lien law, that they would look to them for payment. The first of these notices was served on the 16th of October, 1882, and the last on the 23d of December following. The creditors who, by force of their notices, asserted a right to the moneys due from the county, denied that the assignment to Lindsley passed any right, as against them, to the fund. This denial placed the board of chosen freeholders in a position where they could not, with safety to themselves, pay either Lindsley or those who claimed adversely to him. They thereupon filed a bill of interpleader, and paid the amount due from them into court. A decree was subsequently made, after the defendants had answered, directing the defendants to interplead and settle their respective claims to the fund in controversy in this court. The questions now to be decided arise under the answers filed in pursuance of this decree.

The creditors who claim adversely to Lindsley, contest his right to the fund in dispute on two grounds : first, they say the assignment gives him no right to the fund because it was made to defraud them as creditors of Morriss ; and second, that

if it is honest, it did not pass the fund, as against them, because by a provision of the contract, all moneys earned under it, stood irrevocably pledged for the payment, in the first instance, of the debts incurred by Morriss in its fulfillment, and were inalienable by him until such debts were paid.

The proofs fail to establish the charge of fraud. There is no reason to suspect that the assignment was made for any other than a legitimate and perfectly honest purpose. The circumstances under which it was made may be stated as follows: Lindsley stood liable as endorser for Morriss to the extent of $7,500 on notes on which Morriss had procured the money; Morriss's pecuniary condition was such that, without further assistance, he could not go on with the work under the contract; he applied to Lindsley for further help, who refused to give it without security; Morriss was unable to give security, and it was then arranged that the contract should be assigned to Lindsley, and that he should do whatever remained to be done to complete the contract, and that whatever had already been earned under the contract, as well as what should thereafter be earned, should stand as security for what Lindsley was then liable for, and also for such expenditures as he should subsequently be required to make. The notes on which Lindsley was liable as endorser were held, at the time the assignment was made, by the bank which had discounted them; immediately after the assignment, Lindsley took them up with his own notes. The object of the assignment, as understood by the parties, was simply to secure and indemnify Lindsley. This purpose does not, however, appear on its face; it is absolute in form, and purports to transfer to Lindsley, unconditionally, all that Morriss had earned under the contract. It was this circumstance which gave birth to the suspicion that the assignment had been executed for a fraudulent purpose. There is no legal evidence showing the exact sum which had been earned under the contract at the time the assignment was made. Mr. Lindsley testified that Morriss told him, during the conferences which immediately preceded the assignment, that there were then $10,000 or $12,000 coming to him from the county, but whether he

spoke from his own estimate of the value of the work already done or from an estimate made by the architects, does not appear. Morriss's statement to Lindsley comprehends the whole of the evidence now before the court on this point.

The argument on the part of the defendants, who claim adversely to Lindsley, proceeds on the assumption that it is an established fact in the case that, at the time the assignment was made, Morriss had earned under the contract over $10,000, and that the purpose intended to be effected by the assignment was to pass to Lindsley Morriss's right to this large sum, in discharge of a liability for a sum much less in amount. But neither of these facts is proved in such manner as to be the fit basis of a judicial decision. On the contrary, the evidence makes it entirely clear that the assignment was executed simply to secure and indemnify Mr. Lindsley, and that it had no other purpose. The evidence in proof of this fact amounts, in my judgment, to a complete demonstration. It is true, it appears there was no express understanding between Morriss and Lindsley as to what Lindsley should do with the surplus in case he received more money than he should require to re-imburse himself, but the circumstances surrounding the transaction show very clearly that the minds of the parties were agreed on this subject, and that their tacit understanding was in complete harmony. They both understood that if Lindsley should receive more than was sufficient to pay him his debt and to re-imburse him for his outlay in completing the contract, the surplus should go to Morriss's creditors. One of the defendants, claiming adversely to Lindsley, testified that on the very day the assignment was made Lindsley told him it had been made, and that he would receive more money than would be required to satisfy his claim, and that if he did, the surplus would be turned over to Morriss's creditors. There is no evidence in the case tending to show that he ever afterwards, by word or act, evinced either a purpose or inclination to defeat the right that he then admitted. Lindsley stood bound as Morriss's surety for the faithful performance by Morriss of his contract. For Morriss to indemnify him against loss in consequence of that liability was, under the circumstances, not

13

only a thing which he might lawfully do, but a thing which a fair sense of honor required him to do. A debtor has a right to prefer one or more of his creditors over the others, and so long as he exercises this right honestly, his acts, whether the preference be created by sale or pledge, are unimpeachable. The charge of fraud is not sustained.

But it is contended, in the second place, that Morriss, by his contract with the board of chosen freeholders, deprived himself of the right or power to sell or assign the fund in controversy, so as to give his assignee a right to the fund superior to that which the contract confers upon such persons as should become creditors of Morriss, by furnishing him with the means to perform the contract. The clause of the contract upon which this contention is based reads as follows :

"Should any person or persons that have furnished materials for, or done any labor or work on the building herein contracted for, present to the parties of the first part any claim or claims for such materials, work or labor, then the said parties of the first part shall have the right to withhold any and every one of the above-mentioned payments until such claim or claims so presented are settled and a receipt for the same delivered to the parties of the first part."

This provision of the contract, it is argued, when construed according to the intention of the parties, must be held to have created a trust of this character ; that all moneys which Morriss earned under the contract were, the moment they were earned, assigned, by mere force of this provision, to the board of chosen freeholders, for the benefit of such persons as should become Morriss's creditors in consequence of having furnished him with any of the means which he used in performing the contract, and were to be held by the board for the benefit of such creditors until their debts were paid. I can find, in the language used by the parties, no glimpse of a purpose like that attributed to them by this construction. It is certain that no assignment is made by express words, nor am I able to find, in the language of this provision, the slightest indication that either of the parties supposed that it was possible for anything to occur which, without a further act on the part of Morriss, would operate to transfer

his rights under the contract. His dominion over the money earned under the contract is left just as complete and as absolute as it would have been if this stipulation had formed no part of the contract, except in one event, namely, on the presentation of a claim for material or labor, the board of chosen freeholders shall have the right to withhold any moneys due until such claim shall be paid. They are not authorized to pay, but merely to withhold. Morriss, however, exercised his right to do with his own as he pleased while his dominion was complete, and before any attempt had been made to impound the moneys in the hands of the board of chosen freeholders. His act in that regard is not in violation of his contract; he has not even promised that he would not collect or assign the moneys earned under the contract; all that he has stipulated is that, on the presentation of a claim for material or labor, the board should, as against him, have a right to withhold, but, until a claim is presented, his power and dominion over the fund remain free and unfettered.

The provision in behalf of creditors made by this contract is not as broad nor as beneficial as that made by the third section of the mechanics lien law. Under the lien law the person on whose land a building is in course of erection under a contract duly filed, may, on receiving notice from a creditor of the contractor whose debt was contracted in the erection of his building, that the contractor has, on demand, refused to pay, retain the sum claimed out of the money due to the contractor, and on being satisfied of the correctness of the claim, pay it, and such payment will be valid against the contractor. The notice in such case operates as an assignment. The lien law authorizes both retention and payment, while the contract under consideration authorizes retention merely. The construction of this provision of the lien law is settled. Until notice is given, the contractor may make any disposition of the moneys earned under the contract that he sees fit. The right of the workman or materialman does not attach until notice is given, and if, before that time, the contractor assigns his right, then, when the notice comes, there is nothing on which it can operate. It assigns nothing then because there is nothing owing to the contractor. The statute does not give

the workman or materialman a lien on the moneys earned under the contract, but merely gives him, in case the contractor refuses, on demand, to pay him what he ought, a right, by his own act, to effect an assignment of so much of the money due from the owner to the contractor as will be sufficient to pay his debt. *Craig* v. *Smith, 8 Vr. 549.*

But further discussion on this point is unnecessary. The interpretation which this clause of the contract must receive has already been decided. In *Shannon* v. *Mayor of Hoboken, 10 Stew. Eq. 123,* the contract provided, in case the contractor did not pay for all material provided for and labor done on the work to be done under the contract, that the other contracting party should have the right to apply any moneys due to the contractor to the payment of such debts, and such payments should operate as a payment to the contractor. The mere default of the contractor authorized the other contracting party to pay the contractor's debts incurred in performing the contract. But this power had not been exercised. This court held that this stipulation did not operate as an equitable assignment of the moneys earned under the contract to the creditors of the contractor, nor did it deprive the contractor of his right to dispose of them, but that the contractor had full right to sell and assign at any time before the other contracting party acted under the authority given to them to pay his debts. This construction of the contract was approved and affirmed by the court of errors and appeals. *S. C. on appeal, 10 Stew. Eq. 318.*

The result is that it must be held that the assignment was effectual to pass to Lindsley whatever rights Morriss held under the contract.

Most of the defendants claiming adversely to Lindsley state that they would not have given Morriss credit to the extent they did but for this provision of the contract, and they also say that they understood the contract to pledge the moneys earned under it for the payment of the debts which Morriss should incur in performing it, and they therefore gave him credit, not on his personal responsibility, but on the security which the contract provided. There is also some evidence tending to show that

Morriss represented that the moneys earned under the contract were, by the terms of the contract, to stand as security for the debts which he should incur in performing it. The contract will bear no such interpretation, and it is difficult for me to conceive how any reading of the whole of it, even the most cursory, could have resulted in such a total misapprehension of its provisions. Morriss may have honestly misunderstood its provisions, or he may have fraudulently misrepresented them, but his contract, whether innocent or fraudulent, cannot deprive Lindsley of the right to have the contract construed and enforced according to its terms. So far as the evidence shows, Lindsley has done nothing which will justify the court, in deciding this case, to put a construction on the contract different from that which its language will warrant.

Part of the fund in controversy represents the value of extra work, or work done in addition to that which the contract required. Whether this work was done by Morriss or by Lindsley, the proofs do not show. If it was done by Morriss, Lindsley is not entitled to compensation for it. By the terms of his assignment, he can take nothing but the money earned under the contract.

A few days after the assignment was made, Morriss confessed a judgment to Lindsley as additional security for the money he had paid for Morriss. A sale of Morriss's personal property, under this judgment, was afterwards made, from which Lindsley realized a little over $490. Lindsley purchased the whole or nearly the whole of the property sold. It is admitted that the property was fairly worth $300 or $400 more than he paid for it. It is insisted, in view of this fact, that in ascertaining the amount which should be paid to Lindsley that he should be charged, not with the amount for which the sheriff sold him the goods, but with their fair value. The sheriff's sale is not impugned by the pleadings, nor has any fact been proved which would justify the court in setting the sale aside. So long as a sheriff's sale stands, the price which the purchaser agreed to pay and the sheriff to accept must be taken as a conclusive test of the value of the thing sold. *Snyder* v. *Blair, 6 Stew. Eq. 208.*

In ascertaining the amount which should be paid to Lindsley out of the fund in court, he is chargeable with nothing on account of this sale beyond what he realized.

A decree in conformity to the views expressed in this opinion will be advised. If counsel cannot agree upon the amount which Mr. Lindsley should receive, an opportunity will be afforded to the parties to submit further proofs respecting the extra work.